UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Peter Scanlan,                  :
        Plaintiff,              :
                                :
        v.                      :    File No. 1:05-CV-291
                                :
John E. Potter, Postmaster      :
General, United States          :
Postal Service,                 :
        Defendant.              :

OPINION AND ORDER
(Paper 45)

Plaintiff Peter Scanlan, proceeding *pro se*, brings this
action claiming disparate treatment and sexual harassment in his
workplace.  Defendant John Potter, Postmaster General of the
United States Postal Service, now moves for summary judgment on
Scanlan's claims.  For the reasons set forth below, Potter's
motion (Paper 45) is GRANTED and this case is DISMISSED.

Factual Background

Scanlan is an employee at the United States Postal Service
Processing and Distribution Center ("PDC") in White River
Junction, Vermont.  He has worked at this facility since 1994.
During the time period relevant to this litigation, he worked as
a mail handler in letter preparation.  The PDC Plant Manager was
Scott Beeman, and Scanlan's supervisor was James O'Malley.
O'Malley's job title was Supervisor of Distribution Operations
("SDO").  Other SDOs included Jeffrey Mayo and Clyde Nurse, each

1

of whom were sometimes called upon to act as Scanlan's supervisor when O'Malley was unavailable.

Scanlan's complaint alleges that between May 11, 2003 and October 20, 2004 he was discriminated against and subjected to a hostile work environment.  Specifically, he claims that management at the PDC responded to complaints from women but, because he is male, ignored his complaints.  He also claims that he was disciplined more severely than his women counterparts.  In the conclusion to his complaint, Scanlan writes that "[Plant Manager] Beeman ignores my situation, as I will show with comparisons to female employees in our office Past [sic] and present.  I will also show with his supervisors reacting to the women more favorably."  (Paper 44 at 2).  Scanlan's amended complaint seeks to hold the United States Postal Service vicariously liable for the actions of its supervisors.  Id. at 2-3.

Most of the relevant events in this case began in May 2003, when Scanlan complained that his co-workers were inappropriately monitoring his work.  These co-workers included Henry Buckwold, who at times also served as a temporary supervisor, and Buckwold's girlfriend Terry Spooner.  On or about May 11, 2003, as a result of Spooner's alleged monitoring, Scanlan was paged back to his work area during his breaks, his lunch, and while using the bathroom.  (Paper 58-6 at 1-2).  Scanlan complained to

management, claiming that "no one but my supervisor should be tracking my movements and placing me in a hostile work place." (Paper 47-4 at 2).  Buckwold continued to monitor Scanlan over the next few days, asking co-workers about his whereabouts and openly questioning the timing of his breaks.  Scanlan felt that Buckwold's conduct was harassing and embarrassing, and possibly motivated by Scanlan's complaint to supervisors about Spooner. (Paper 58-6 at 3).

On May 20, 2003, another co-worker complained to management about productivity in Scanlan's work area.  Scanlan again felt that he "should not have to answer to my coworkers." Id. at 3. That same day, he was paged to his work area while using the bathroom.  He reported to supervisor Clyde Nurse that he wanted to meet with Plant Manager Beeman because he "was sick and tired of labor managing me . . . ." Id. at 4.  Nurse explained that Beeman would not be available until Thursday, May 22, 2003. Scanlan met with SDO O'Malley, and felt the meeting was "very productive" but still wanted to meet with Beeman.  Id. at 5.

On Monday, May 26, 2003, SDO Mayo observed Scanlan talking on the workplace floor and believed the conversation was impeding productivity.  Mayo called Scanlan away from his work area. Scanlan reacted negatively to being singled out, and felt that others were involved in the conversation as well.  He became upset and began yelling and cursing.  As Scanlan explained in a

3

subsequent written statement, "[w]ith everything that was going on that week I lost my cool, in retrospect I wish I had controlled this situation better but couldn't contain my emotions." Id. at 6.  Mayo asked Scanlan to leave the work area and move to an office where they could continue their discussion.

Mayo has submitted an affidavit in which he explains that once in the office, Scanlan did not calm down.  (Paper 49 at 3). Based on Scanlan's "loud and disruptive behavior," Mayo concluded that Scanlan should not remain in the workplace.  Id. Accordingly, he escorted Scanlan "out the door and told him to contact the Plant Manager before he returned to work."  Id.

Mayo took this action pursuant to USPS's Emergency Placement in Off-Duty Status procedure.  The next day, May 27, 2003, Mayo sent Scanlan written notice of the use of the Emergency Placement procedure.  The notice also informed Scanlan that his request for sick leave for May 27-29, 2003 had been approved, and that a decision would be made in the near future with respect to any disciplinary action to be taken as a result of his conduct.  Id. at 4-5.

Scanlan spoke with Plant Manager Beeman on May 27, 2003. Beeman allowed Scanlan to return and reconcile with Mayo, but warned that he might still face disciplinary action.  On June 13, 2003, Scanlan contacted an EEO counselor.  He later filed an Information for Pre-Complaint Counseling in which he complained

4

about having been sent home from work.  His primary claim was that he had been treated unfairly compared to female co-workers. (Paper 53-3).[1]  On June 17, 2003, Scanlan's union representative filed a grievance pertaining to Mayo's use of the Emergency Placement on Off-Duty Status procedure.  (Paper 58-12 at 5).

On June 20, 2003, Mayo prepared an Official Letter of Warning concerning the events on May 26th.  In the Letter, Mayo alleged that Scanlan used profanity and shook his finger in Mayo's face.  "Your comments and behavior are unacceptable and not appropriate for the workplace."  (Paper 49-5 at 1).  The Letter warned that "future deficiencies of this nature will result in more severe disciplinary action" and advised Scanlan of his right to file a grievance.  Id. at 2.

On June 26, 2003, Scanlan met with O'Malley and Scanlan's union representative to discuss the Letter of Warning.  According to a declaration submitted by O'Malley, Scanlan was apologetic about his conduct.  (Paper 51 at 3).[2]  Believing that Scanlan's

---

[1] This was Scanlan's second discrimination complaint while at the PDC.  On September 15, 2000 he made a complaint of discrimination related to an incident in which Buckwold had allegedly been verbally abusive toward him.  Scanlan claimed that a supervisor witnessed the incident and did nothing.  On October 2, 2000, USPS notified Scanlan that the supervisor denied discrimination and that Scanlan had a right to file a formal complaint of discrimination.  No formal complaint was made, as Scanlan submits that the matter was settled "at the informal stage."  (Paper 58 at 2).

[2] In his response to the defendant's statement of material facts, Scanlan does not contest the assertion that he was

behavior would not be repeated, O'Malley ripped up the Letter of Warning and downgraded it to an official discussion, which is not recorded in an employee's file.  Id.

On July 2, 2003, Scanlan met with an EEO Dispute Resolution Specialist to discuss his discrimination claim.  For relief on his claim, Scanlan requested 80 hours of annual leave and three days of sick leave credited to his balance.  He also requested a transfer.  The parties were unable to reach a resolution, and on August 6, 2003 Scanlan filed a formal EEO complaint.  His complaint again alleged that Mayo discriminated against him when he sent him home, and that if Scanlan had been a woman the situation would have been handled differently.  (Paper 53).

On July 15, 2003, Mayo settled the grievance pertaining to the use of the Emergency Placement on Off-Duty Status, agreeing to pay Scanlan for the time he lost after being sent home that day.  As Mayo explains in his declaration,

> I agreed to pay him for the time he lost on May 26, 2003, because I learned that although it was appropriate for me to use the procedure in the circumstances I encountered with Mr. Scanlan, he should have remained in a pay status for the day.  I firmly stand by my belief of the need to remove Mr. Scanlan from the workplace that day.

(Paper 58-12 at 5-6).

---

apologetic.  (Paper 47 at 8); (Paper 58 at 3-4).  In his deposition, however, he denied having shown remorse in front of O'Malley.  (Paper 47-3 at 17).  Nonetheless, he conceded that he and Mayo shook hands, and that he expressed to a fellow employee his regret at having "lost [his] cool."  Id.

On or about January 19, 2004, Scanlan notified Mayo that he had medical restrictions due to an injury.  Mayo sent Scanlan home, informing him that there were no available tasks within those limitations.  Mayo was later informed by SDO Nurse that Scanlan had been given limited tasks the previous day.  After Scanlan filed a grievance to receive regular pay for January 19, 2004, he was credited sick leave and paid for eight hours of work.  (Paper 58-12 at 6); (Paper 50 at 3).

<u>Discussion</u>

I.   <u>Summary Judgment Standard</u>

Summary judgment should be granted only when there is no genuine issue of fact and the moving party is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  The moving party has the initial burden of demonstrating that there is no genuine issue of material fact.  <u>See</u> <u>Marvel Characters, Inc. v. Simon</u>, 310 F.3d 280, 286 (2d Cir. 2002); <u>Goenaga v. March of Dimes Birth Defects Found.</u>, 51 F.3d 14, 18 (2d Cir. 1995) (stating that movant may meet burden by "point[ing] to an absence of evidence to support an essential element of the nonmoving party's claim.").  Once the movant satisfies this burden, the non-moving party must respond by setting forth "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

7

In determining whether summary judgment is appropriate, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 126 (2d Cir. 2004). "In addition, pro se litigants must be given extra latitude, particularly on a summary judgment motion." Thomas v. New York State Dep't of Corr. Servs., 2006 WL 435718, at *4 (S.D.N.Y. Feb. 23, 2006) (citing McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (pro se pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest")).

II.  Gender Discrimination

Scanlan claims that if he were not male, his complaints about his work environment would have been investigated and  he would have been disciplined differently.  Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(a)(1).  Scanlan's gender discrimination claims asserted under Title VII are governed by the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  To establish a

prima facie case of employment discrimination, a plaintiff must
show that: (1) he is a member of a protected class; (2) he is
qualified for the position; (3) he has suffered an adverse
employment action; and (4) the circumstances surrounding that
action give rise to an inference of discrimination.  Id.  Once
the plaintiff has made out a prima facie case, the employer is
required to offer a legitimate, non-discriminatory business
rationale for its actions.  Id. at 802-03.  If the employer
articulates such a reason, the presumption of discrimination
dissolves, and the burden shifts back to the plaintiff to prove
that the employer's stated reasons are merely pretextual and that
discrimination was one of the reasons for the adverse employment
action.  Id. at 804.

In "reverse discrimination" claims such as Scanlan's gender
discrimination claim, some courts have applied a somewhat
stricter version of the McDonnell Douglas standard, holding that
a prima facie case must indicate some "background circumstances
supporting the suspicion that the defendant is that unusual
employer who discriminates against a favored group." Brierly v.
Deer Park Union Free Sch. Dist., 359 F. Supp. 2d 275, 294 n.7
(E.D.N.Y. 2005) (citing Parker v. Baltimore & Ohio R.R. Co., 652
F.2d 1012, 1017 (D.C. Cir. 1981)).  In this Circuit, application
of this heightened standard is not universal.  Compare Olenick v.
New York Tel., 881 F. Supp. 113, 114 (S.D.N.Y. 1995) (applying

9

heightened standard) <u>with</u> <u>Ticali v. Roman Catholic Diocese of</u>
<u>Brooklyn</u>, 41 F. Supp. 2d 249, 260-62 (E.D.N.Y. 1999).  The Second
Circuit has not taken a position on the issue.  <u>See</u> <u>Seils v.</u>
<u>Rochester City Sch. Dist.</u>, 192 F. Supp. 2d 100, 109 (W.D.N.Y.
2002).  The correct standard need not be determined in this case
because, regardless of the test used, Scanlan has failed to
establish a prima facie case of discrimination.

　　　The defendant argues that Scanlan has not suffered an
adverse employment action.  An employment action is adverse if it
causes an employee to endure a "materially adverse change" in the
terms and conditions of his employment.  <u>Galabya v. New York City</u>
<u>Bd. of Educ.</u>, 202 F.3d 636, 640 (2d Cir. 2000).  "A materially
adverse change might be indicated by a termination of employment,
a demotion evidenced by a decrease in wage or salary, a less
distinguished title, a material loss of benefits, significantly
diminished material responsibilities, or other indices . . .
unique to a particular situation."  <u>Id.</u> (quoting <u>Crady v. Liberty</u>
<u>Nat. Bank & Trust Co. of Indiana</u>, 993 F.2d 132, 136 (7th Cir.
1993)).  To be "materially adverse," a change in working
conditions must be "more disruptive than a mere inconvenience."
<u>Galabya</u>, 202 F.3d at 640 (quoting <u>Crady</u>, 993 F.2d at 136).

　　　Scanlan alleges a series of arguably adverse actions by his
employer, including sending him home, issuing him a Letter of
Warning, and failing to pursue his hostile work environment

claims.  As to the first of these actions, the undisputed facts
are that Scanlan was sent home and was later credited that day's
pay.  The issue before the Court with respect to this action, and
particularly the temporary deprivation of pay, is whether it was
sufficiently adverse to be actionable under Title VII.

In Joseph v. Leavitt, 465 F.3d 87, 90-91 (2d Cir. 2006), the
Second Circuit held that placing an employee on extended
administrative leave with pay pending an investigation did not
constitute an adverse employment action.  Citing similar holdings
in other circuits, the Second Circuit adopted the position that
"the terms and conditions of employment ordinarily include the
possibility that an employee will be subject to an employer's
disciplinary policies in appropriate circumstances."  Joseph, 465
F.3d at 91 (citation omitted).  In that case, "the terms and
conditions of Joseph's employment did not include a right to
expect that he would be allowed to continue his responsibilities
while he was facing serious criminal charges."  Id.

Here, Scanlan did not have the right to violate USPS policy
by acting as he did toward SDO Mayo.[3]  He himself admits that he
regrets his conduct and that he wishes he had acted differently.

---

[3] The Letter of Warning stated that Scanlan's conduct
violated USPS policy against conduct that is "obnoxious or
offensive to other persons" or that creates "unpleasant working
conditions."  The Letter also claimed that Scanlan had violated
USPS policy with respect to violence and behavior in the
workplace.  (Paper 49-5 at 1).

The fact that he was sent home, by itself, did not constitute an adverse employment action, as it was certainly no more disruptive than the lengthy administrative leave imposed in <u>Joseph</u>.  While the deprivation of pay may have been an adverse action at the time, the Court finds that the restoration of pay for that day rendered the action no longer "material."

Even if, for the sake of argument, sending Scanlan home without pay was an adverse employment action, the record does not support an inference of discrimination with respect to this specific action.  Scanlan alleges that his treatment was particularly severe because he is male, and that women employees who have cursed at supervisors have not been placed on Emergency Placement status.  Viewing the undisputed facts in a light most favorable to the plaintiff, the evidence does not show that these other incidents were comparable to Scanlan's May 26, 2003 interaction with Mayo.

In his deposition, Scanlan conceded that he and Mayo had a "heated" exchange, were pointing fingers at each other, and that he "lost his cool."  (Paper 58-2 at 8).  In Mayo's view, Scanlan was not able to control himself.  As Mayo states in his affidavit, Scanlan's "loud and aggressive behavior toward me led me to believe that for his safety and the safety of others, he should not remain at the workplace."  (Paper 49 at 3).

With respect to the women who were allegedly given more
lenient treatment, the common factor between Scanlan's conduct
and the conduct of these women was the use of foul language.
There is no evidence, however, that any of these women were
unable to control their emotions.[4]  Mayo describes one situation
in which a woman employee cursed at him, was asked to step into
an office and speak with SDO O'Malley, calmed down and was able
to return to work.  (Paper 49 at 4).  A Letter of Warning was
issued to this employee, and unlike in Scanlan's case, the Letter
was never downgraded.  Id.  Other women employees have acted
inappropriately as well, and Mayo has spoken with them about
their conduct.  Id.  Again, the record does not show that their
misconduct was accompanied by the sort of intense misbehavior
evidenced by Scanlan.

Other allegedly comparable incidents involved women cursing
at or in the presence of SDO O'Malley.  Because the supervisor in
those instances was O'Malley, and not Mayo, those employees were
arguably not "similarly situated." See, e.g., Shumway v. United
Parcel Service, 188 F.3d 60, 64 (2d Cir. 1997) (individuals used
for purpose of comparison must be "similarly situated in all
material respects"); Beauchat v. Mineta, 2006 WL 2711608, at *7

---

[4] Scanlan and Mayo do not agree about Scanlan's hostility
level at that time.  Nonetheless, even if the Court views the
facts as presented by Scanlan, he was verbally abusive and, at
least temporarily, unable to control his emotions.

13

(E.D.N.Y. Sept. 21, 2006) (no showing that others shared same supervisors or engaged in similar conduct). Moreover, those employees each received Letters of Warning that were not downgraded, and there is no evidence that they were out of control or viewed to be unsafe in the workplace. (Paper 51 at 3).[5]

Scanlan also claims that other men, including Buckwold, have received favorable treatment. This claim does not support an argument under Title VII. See Brennan v. Metropolitan Opera Ass'n Inc., 192 F.3d 310, 318 (2d Cir. 1999). If anything, it undermines Scanlan's claim that he was treated differently because of his gender, and lends support to the defendant's argument that there were non-discriminatory reasons for discipline.

The next arguably adverse action was the Letter of Warning issued by Mayo. The Court doubts that a single warning letter is sufficient to constitute actionable employment action under Title

---

[5] As recounted by Scanlan's fellow employee, and union representative, William Creamer, there was an incident that took place during a meeting with SDO O'Malley. Two women employees became quite hostile toward a third employee, insulting him and using foul language. According to Creamer, a door was slammed and a chair was thrown. (Paper 58-19 at 41-57). Nonetheless, as O'Malley explains in his affidavit, these women "were not disruptive on the workroom floor and did not maintain uncontrollable anger." (Paper 51 at 3). They were ultimately disciplined with Letters of Warning. Id. Creamer would not state in his deposition whether, in his opinion, the women were out of control. (Paper 58-19 at 50).

14

VII.  See Moore v. Potter, 353 F. Supp. 2d 410, 415 (E.D.N.Y. 2005) (questionable whether letter of warning constitutes adverse employment action when plaintiff fails to establish what consequences resulted from letter); see also Hill v. Children's Village, 196 F. Supp. 2d 389, 397 (S.D.N.Y. 2002) ("Plaintiff did receive a warning letter regarding her conduct . . . .  However this alone is insufficient to create a tangible employment detriment.") (citations omitted); Ezell v. Potter, 400 F.3d 1041, 1049 (7th Cir. 2005) ("a letter of warning is generally considered insufficient to qualify as an adverse employment action").  In this case, the Letter of Warning was destroyed six days later and, as a result, no record of discipline was placed in Scanlan's file.  Given that the Letter, which itself may not have supported a Title VII claim, was quickly destroyed and the level of discipline downgraded to a discussion, the Court finds that the Letter of Warning did not constitute an adverse employment action.

Scanlan also argues that he suffered gender discrimination when supervisors failed to investigate his claims of a hostile work environment.  Courts have held that Title VII protects employees from managers who condone and encourage bad conduct by failing to investigate or remedy it.  See, e.g., Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006); Galdamez v. Potter, 415 F.3d 1015, 1022 (9th Cir. 2005).  Nonetheless, the

15

employer's conduct must still be discriminatory, and in this case the facts do not give rise to any inference of discrimination on the basis of gender.

Scanlan compares his hostile work environment complaints to a claim of sexual harassment lodged by USPS employee Joyce Sabo. In the Sabo incident, another postal employee reported that a male employee had made an inappropriate sexual gesture toward Sabo. Beeman requested an investigation, but supervisors were unable to verify the allegation. (Paper 48-2 at 1). To Beeman's knowledge, Sabo did not contact the EEO about her concerns. Id. at 2.

An employer is required to investigate claims of sexual harassment. See Malik v. Carrier Corp., 202 F.3d 97, 105 (2d Cir. 2000). Scanlan's complaints to supervisors were of a different nature. Moreover, he admits that when he complained to SDO Nurse about harassment in his workplace, he did not allege that he was being harassed because of his gender. (Paper 47-3 at 14).

Scanlan offers no support for the proposition that an employer must investigate every complaint it receives from its employees. Scanlan's workplace complaints focused on the fact that his fellow employees appeared to be monitoring his movements and behavior. As discussed more fully below, the fact that he characterized his experience as "harassment" and "hostile" did

16

not, without some form of discrimination, translate his workplace into a hostile work environment covered by Title VII. Furthermore, the evidence before the Court at summary judgment does not support an inference of discriminatory conduct. Accordingly, Scanlan has failed to meet his burden of showing a prima facie case under Title VII.

Even if Scanlan had met his burden, the defendant's witnesses have submitted affidavits setting forth legitimate reasons for acting as they did.  Mayo explains that when Scanlan became agitated during their interactions on May 26, 2003, he asked Scanlan to move to an office so as to avoid any disruption on the workplace floor.  When it appeared that Scanlan was not calming down in the office, Mayo determined that Scanlan should not remain at the office that day.  He therefore escorted Scanlan to the door and instructed him to contact the Plant Manager (Beeman) before he returned to work.  (Paper 58-12 at 3).

Scanlan disputes the suggestion that he was unable to calm himself down, and disagrees with Mayo's decision to send him home.  (Paper 58 at 3).[6]  While it may be the case that, given some extra time in the office, Scanlan could have calmed down enough to return to the workplace floor, it is not for this Court "to sit as a super-personnel department that reexamines an

---

[6] In his deposition, Scanlan contended that if Mayo had left the office "and given me 10 minutes, I would have been able to go back on the floor."  (Paper 58-2 at 10).

17

entity's business decisions." Faldetta v. Lockheed Martin Corp.,
2000 WL 1682759, at *9-10 (S.D.N.Y. Nov. 9, 2000); see also
Williams v. NYC Dep't of Sanitation, 2001 WL 1154627, at *18
(S.D.N.Y. Sept. 28, 2001) ("This Court may not second-guess an
employer's non-discriminatory business decisions, regardless of
their wisdom."). Mayo has articulated clear, specific and, in
his view, legitimate reasons for his actions. Stated as such,
his subjective view of the situation is sufficient to erase any
presumption of discrimination. Cf. Lieberman v. Gant, 630 F.2d
60, 67 (2d Cir. 1980) (no inference of discrimination where
employer's explanation, though partially subjective, was offered
in clear and specific terms).

On his claim relating to management's failure to
investigate, Scanlan complains that SDO Nurse was aware of his
"hostile environment" but did nothing to compel an investigation.
However, when Scanlan informed Nurse about harassment by his co-
workers and requested to speak with Beeman, he made no mention of
discrimination. Consequently, Nurse viewed Scanlan's claims as
"run-of-the-mill complaints about co-workers at the facility,"
and informed Scanlan that Beeman was not available at that time.
(Paper 50 at 2).

When Beeman spoke with Scanlan about the incident with Mayo,
Beeman did not believe that Scanlan was asking him to take any
specific action. Nor did he believe that any sort of

18

investigation was required.  "I do not recall if he complained about specific coworkers, but his complaints concerning the workplace were not of the severity or egregiousness that warranted any investigation."  (Paper 48 at 5).  Beeman's impression was that Scanlan was seeking a transfer to Connecticut for personal, family-related reasons.[7]  As Beeman states in his affidavit, Scanlan's "personal situation was a major focus of our conversation."  Id.

If a defendant is able to provide evidence of a non-discriminatory basis for the discharge, then the presumption of discrimination "simply drops out of the picture" and the burden once again shifts to the plaintiff to demonstrate, by a preponderance of the evidence, that the employer's presumptively valid explanation was merely a pretext for discrimination.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510-11 (1993); see McDonnell Douglas, 411 U.S. at 804.  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).

---

[7] In 2001, Scanlan's wife and children moved from Vermont to Hartford, Connecticut.  Hoping that his wife would return to Vermont, Scanlan did not seek a transfer at that time.  Since 2003, however, he has been seeking a transfer to Connecticut.

For reasons discussed above, Scanlan has failed to meet this burden.  Specifically, he has not offered evidence "adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act."  Marlow v. Office of Court Admin. of State of New York, 820 F. Supp. 753, 756 (S.D.N.Y. 1993) (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 358 (1977)).  While courts have held that there is no single way to establish circumstances giving rise to an inference of discrimination, there must nonetheless be evidence of a causal connection between the adverse employment action and plaintiff's membership in a protected class.  See Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37-38 (2d Cir. 1994). In this case, no reasonable juror could conclude that Scanlan's treatment was based on his gender.  Any discipline he received was the result of personnel decisions made by managers at the PDC, based on their understanding of what was in the best interests of the facility.  The defendant is therefore entitled to summary judgment on Scanlan's claim of gender discrimination.

III.  Hostile Work Environment

Under Title VII, an actionable hostile work environment means a workplace "permeated with discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions" of the victim's employment and create an abusive working environment.  Hayut v. State Univ. of New York,

20

352 F.3d 733, 745 (2d Cir. 2003) (internal quotations and citations omitted).  "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview."  Harris v. Forklift Sys. Inc., 510 U.S. 17, 21 (1993).  In Harris, the Supreme Court established a non-exclusive list of factors relevant to determining whether discrimination is severe and pervasive: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id. at 23. As a general rule, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."  Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997) (citations omitted).

Significant to this case, the plaintiff must also show that the hostile work environment was caused by animus towards him as a result of his membership in a protected class.  It is "important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination.  Otherwise, the federal courts will become a court of personnel appeals." Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002); see also

21

Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work . . . [including] subjection to a hostile environment . . . is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic."). "An environment that . . . arises from personal animosity, is not actionable under the civil rights statutes." White v. Fuji Photo Film USA, Inc., 434 F. Supp. 2d 144, 154 (S.D.N.Y. 2006).

Here, the hostility that Scanlan experienced was not sufficiently severe to support a Title VII claim. See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (conduct must be extreme to support a hostile environment claim). Briefly stated, Scanlan was upset about being repeatedly paged back to work. He also did not like having his productivity questioned, and was angry that the monitoring and criticisms came primarily from co-workers and not supervisors. For the most part, these events occurred over the course of two weeks in May 2003. These facts do not rise to the level of persistence, offensiveness or abuse that other courts have found sufficient to make out a claim of hostile work environment. See, e.g., Fitzgerald v. Henderson, 251 F.3d 345, 367 (2d Cir. 2001) (issues of fact were for the jury, after supervisor ceased sexual advances, he subjected plaintiff to two and half years of daily, unfair, and escalating harassment); Raniola v. Bratton, 243 F.3d 610, 621 (2d Cir. 2001)

22

(factual issues presented where plaintiff was subjected to sex-based remarks, disproportionately burdensome work assignments, workplace sabotage and serious public threat of physical harm); Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1189-90 (2d Cir. 1987) (no hostile work environment where plaintiff subjected to harassment by supervisor over six month period), overruled on other grounds by Patterson v. McLean Credit Union, 491 U.S. 164 (1989).

Furthermore, Scanlan has no support for a claim that his work environment was the result of any form of discrimination. He contends that Terry Spooner monitored his movements, but concedes that she was harassing to both men and women.  (Paper 47-3 at 7).  With respect to Henry Buckwold, Scanlan merely speculates that Buckwold might have treated him differently if he had been a woman.  Id. at 11.  Scanlan's primary theory about Buckwold's conduct is that the harassment began after Scanlan complained about monitoring by Spooner (Buckwold's girlfriend). Id. at 12.

As Scanlan explained in his deposition, his harassment claim is linked to his discrimination claim only to the extent that management failed to conduct investigations.  He does not claim that the "hostility" resulting from the actions of his co-workers was based upon his gender.

Q:  Well, I want to, I want to be clear that when we're talking about hostile work environment - -

23

A:  Right.

Q:  - - we're talking about people who are harassing you,
but they're not harassing you because of your gender.

A:  The people themselves?

Q:  Right.

A:  Not management?

Q:  Right.

A:  That's right.

Id. at 12-13.  As discussed above, Scanlan's claim of gender
discrimination by management cannot proceed as a matter of law.
Accordingly, and because Scanlan's hostile work environment claim
was not sufficiently severe to warrant relief, the defendant is
entitled to summary judgment on this claim as well.

IV.  Retaliation

Although difficult to discern from the complaint, Scanlan
may also be raising a claim of retaliation for his EEO activity.
Scanlan's EEO activity took place in 2000 and again in July of
2003.  The defendant has moved for summary judgment on any such
claim, and Scanlan's opposition does not address the issue.

To make out a prima facie case of retaliation, the plaintiff
must show that (1) he participated in a protected activity; (2)
defendant knew of the protected activity; (3) plaintiff suffered
an adverse action; and (4) there was a causal connection between
the protected activity and the adverse employment action.
Kessler v. Westchester County Dep't of Social Servs., 461 F.3d

199, 205-06 (2d Cir. 2006).  The defendant argues that Scanlan
did not suffer any adverse action as a result of his EEO
activity.[8]  The defendant also argues no causal connection due to
the lapse in time between the protected activity and the
allegedly adverse action.  While adverse action, as discussed
above, is at times questionable, the Court finds the defendant's
latter argument dispositive.

Scanlan's initial EEO activity was in 2000, while the issues
he complains of in this case began in 2003.  Although "'there is
no bright line distinction for how close in time an adverse
action must be to the protected activity' in order to establish
an inference of causation," courts have "routinely" found much
shorter time gaps to be insufficient.  Charles v. City of New
York, 2007 WL 2728407, at *11 (S.D.N.Y. Sept. 17, 2007) (quoting
Uddin v. City of New York, 427 F. Supp. 2d 414, 433 (S.D.N.Y.
2006); see, e.g., Knight v. City of New York, 303 F. Supp. 2d
485, 497 (S.D.N.Y. 2004) (fifteen month gap too long).  Scanlan's
second protected activity took place in July 2003, and the next
allegedly adverse employment action took place when Mayo sent him
home in January 2004 for medical reasons.  Again, and absent any
showing that these two events were related, the lapse in time was

---

[8] In a retaliation claim, unlike a gender discrimination
claim, the adverse action need not affect the terms and
conditions of employment.  Burlington Northern & Santa Fe Ry. Co.
v. White, 126 S. Ct. 2405, 2415 (2006).

too great for a reasonable finder of fact to find causation. See, e.g., Ponticelli v. Zurich Am. Ins. Group, 16 F. Supp. 2d 414, 436 (S.D.N.Y. 1998).  Consequently, and to the extent that Scanlan is bringing a claim for retaliation, the claim does not survive summary judgment.

V.  Vicarious Liability

     Because the Court finds no underlying liability on the part of USPS employees, there can be no claim for vicarious liability.

                              Conclusion

     For the reasons set forth above, the defendant's motion for summary judgment (Paper 45) is GRANTED, and this case is DISMISSED.

     Dated at Brattleboro, in the District of Vermont, this day 31st day of October, 2007.

                              /s/ J. Garvan Murtha
                              J. Garvan Murtha
                              United States District Judge